³ Dec.
479  **BILL OF EXCEPTIONS—JURY TRIAL—CONTRACT.**

[Miami Circuit Court, October Term, 1895.]

Shearer, Summers and Allred, J..

†C., H. & D. R. R. Co. v. Morris.

1. WHEN AN ENTRY AUTHENTICATING BILL OF EXCEPTIONS MAY BE MADE NUNC PRO TUNC.

Where a bill of exceptions taken under the act of March 22, 1892 (89 O. L., 124), is signed and allowed and an entry authenticating the same ordered by the trial judge within the time limited by that act, such entry, if omitted from the journal, may be supplied by an order *nunc pro tunc.*

2. WHEN FILING IS NOT ESSENTIAL TO A BILL OF EXCEPTIONS.

The filing of a bill of exceptions within the time prescribed by such act, is not essential to its validity, where it has been properly signed, allowed and ordered to be made part of the record within such time.

3. WHEN RECORD AS TO BILL OF EXCEPTIONS CANNOT BE ATTACKED.

Where the record of the trial court shows the signing and allowance of such bill of ex ceptions, within the prescribed time, such record cannot be attacked in this court by evidence *aliunde*, nor can the certificate of the trial judge be impeached by evidence submitted to him at the time of signing the bill of exceptions and brought upon the record by an independent bill of exceptions; such latter bill of exceptions is unauthorized.

4. EFFECT ON RIGHT TO JURY TRIAL OF FILING CROSS-PETITIONS CONTAINING EQUITABLE ACTIONS.

If a petition states a cause of action triable to a jury, and issues are joined upon such petition, the filing also of cross-petitions containing equitable cross-actions, does not destroy the right of the plaintiff to have a jury trial upon his cause of action unless such cross-petitions extinguish or supersede the case stated in the petition.

5. CONTRACT OF A MEMBER OF COUNCIL CONTRAVENING PUBLIC POLICY.

Where a member of council claims to have contracted with a railway company to enter its employ and devote substantially all his time in the general management of said company's business within his city and in the procurement of rights of way extending through such city, a necessary and substantial part of which comprises cession of rights over its streets and avenues, and such member thereafter during the term of such alleged employment assists, as such councilman, in granting and ceding valuable rights and interests from such city to such railway company, and where such rights so ceded by such city are so connected with the subject matter of said employment as to have a tendency to influence the action of such member of council, such contract and employment contravenes public policy and will not be enforced.

ERROR to the common pleas court.

The original action in the common pleas court was brought by *John W. Morris* v. *The C., H. & D. Railroad Company* on December 29, 1888.

The cause was three times tried to a jury, resulting each time in a verdict for the plaintiff. The first verdict was set aside by the trial judge. The second by the circuit court at a former term for error in the admission of evidence, and because the verdict was against the weight of the evidence. After the cause was remanded to the common pleas court, the plaintiff below, on May 1, 1894, filed his second amended petition which contains two causes of action. The first asserts that the C., H. & D. R. R. Co. was duly organized as a railroad company and engaged in operating a railroad from Cincinnati to Toledo and to the east by the Great Miami river from Piqua. That the Piqua & Troy Br. R. R. Co. was caused to be organized by the C., H. & D. Co. to build a connecting line to the city of Piqua. That the said C., H. & D. Co. by and through its own duly authorized agents as well as by and through the said Piqua and Troy Br. R. R. Co. acting in its behalf, "on or about April 1st, 1885, employed" said Morris "on and about procuring of the right of way of the said The Piqua and Troy Branch Railroad company and to procure subscriptions to aid in the construction thereof, and to take the general management and supervision of the company's business at Troy, Ohio."

That said Morris was authorized in cases where the right of way could not be purchased to buy entire tracts, take the title in his name or others when di-

rected by the company, and sell the excess beyond the right of way.

That he made the following purchases: December 19, 1885, Kinkead lots, $10,296; December 31, 1885, Sayers lots, $1,150; June 8, 1886, Allen lots, $900; June 10, 1886, Helman lots, $600; June 10, 1886, Fuller lots, $800; June 14, 1886, Schaible lots, $150; June 15, 1886, White lots, 850; June 19, 1886, Rein-fried lots, $1,350; June 28, 1886, Whitman lots, $1,400; June 16, 1886, Kinkead lots, $500; August 11, 1886, Leffel lots, $905; September 8, 1886, McKaig lots, $500; September 27, 1886, McKaig lots, $750; September 28, 1886, Barnett condemnation, $1,086.70; February 23, 1887, Morris lots, $450; November 11, 1887, Cruikshank lots, $2,100.

Morris gives credit as follows: June 9, 1886, $7,650; July 3, 1886, $2,550; June 12, 1887, sale of Fuller house and lot, $596.50; November 26, 1887, sale of out-lot 40, $400; November 10, 1887, sale of lots 44 and 129, $1,500; September 10, 1888, sale of lots 43 and 44, $2,500; November 26, 1887, sale of lot 323, $450.

After adjusting interest Morris claims $9,515 due him.

For a second cause of action he asserts that on or about April 1, 1895, "he entered the service" of the C., H. & D. Co., "in the employment of procuring the right of way for the location, construction and operation of the Piqua and Troy Branch Railway and of securing subscriptions from those supposed to be interested in the construction of said road, and to aid in the construction thereof, and in the general supervision and management of said defendant's business re-lating thereto at Troy, Ohio, and remained in the employ of said defendant from that date on, and continuously on, until December 26, 1888; and that while so employed rendered great and valuable services to said company, procuring for it a large portion of said right of way which, otherwise said defendant would not have been able to secure but at vast expense, secured them many and valuable subscriptions, managed their business in and about all matters relating to the procuring of said right of way and said descriptions; and did and performed for said defendant (C., H. & D. Co.), all and singular the duties required of him and devoted almost his entire time and attention to, for the period of three years and eight months."

He alleges these services to be worth $13,000.

He avers that he tendered to the C., H. & D. Co. good and sufficient deeds for all of the lands not disposed of, conveying them to the P. & T. Br. Co. which the C., H. & D. Co. refused to accept, but took possession of the lands and appropri-ated them to its own use.

He also alleges various other tenders of conveyances to the C., H. & D. Co., some of which are brought into court as continuing tenders. He alleges that the C., H. & D. Co. refused to accept such deeds, or in fact, any deed.

The C., H. & D. Co. in its answer:

*First*—Enters a general denial except as to the corporate existence of the railroad companies.

*Second*—Sets up that the said rights of way were procured for the P. & T. Br. Co., under a written contract of date of May 19, 1886, for the sum of $10,200, and that said contract had been fully performed on the part of said R. R. Co., and said rights of way fully paid for.

*Third*—That said Morris during said alleged agency, was a member of council of the city of Troy. That the construction of said railway necessarily involved the acquisition from such council of valuable rights and franchises in the streets and avenues of such city over which said right of way necessarily ex-tended, and that Morris was active in the introduction and passage of certain resolutions and ordinances securing such right of way.

The C., H. & D. Co. and the P. & T. Br. Co. each filed cross-petitions, setting up the contract of May 19, 1886, and Morris' failure to comply therewith, and praying for a specific performance thereof.

The reply of Morris:

*First*—Attacks the good faith of the organization of the P. & T. Br. Co.

*Second*—Alleges that the contract of May 19, 1886, was never intended to be

a contract and was never acted upon as such. That he "proceeded to acquire said rights of way under his verbal contract of employment" with the C., H. & D. Co. "as if said alleged written contract had not been entered into."

*Third*—Alleges said contract of May 19 did not cover the right of way already secured.

*Fourth*—Said alleged contract of May 19 was signed after he had performed services and purchased real estate which defendant had appropriated.

*Fifth*—He denies that he agreed to aid in the procuring of any rights or franchises from the city or that he ever became obligated to do so. That he never did so under any contract of employment or that any act of his while a member of council was then of value to said defendant.

*Sixth*—That long prior to his employment it had been determined that Hydraulic avenue should be opened up and appropriated for the use of any railroad company which would build a railroad on it to the Troy hydraulic and thence to a Chicago connection, and the fact that said plaintiff was a member of council was not in contemplation by either party. Before said contract of employment, C. C. Wait, vice-president and and general manager of the C., H. & D. Co., having represented to the council that if granted the right of way over the streets and alleys of said city such company would build to a Chicago connection, and thereby secured a pledge from the city council and each individual member thereof, individually and collectively, to grant such right of way whenever the route of such company was definitely fixed, and that "whatever was done by plaintiff in council afterwards was merely formal and in compliance with said pledge and agreement and solely in the interest of said city. He says he has never expected, claimed or received any pay therefor, nor now expects, claims or desires any pay for it, and he denies that he was ever employed by said defendant or by any person or corporation to procure said right of way over the streets and alleys of said city for any railroad whatever."

Separate demurrers were filed by each of the railway companies, which were overruled by the court.

The defendant thereupon moved the court for a trial to the court without the intervention of a jury, which the court refused, and proceeded with a jury to try the case.

At the conclusion of the plaintiff's testimony the defendant moved the court to discharge the jury and render judgment for the defendant.

*First*—Because the contract claimed by the plaintiff was illegal and void.

*Second*—It was in contradiction to the written contract of May 19, 1886. The motion was overruled and exceptions were taken by the defendant.

The trial thereupon proceeded and resulted in a verdict for the plaintiff upon both causes of action.

A motion for a new trial was made in due time, and overruled, and a bill of exceptions taken.

At the time of the allowance of the bill of exceptions by the trial judge, counsel for plaintiff below presented in writing 118 objections to the bill, some of which were supported by affidavits.

Some of these objections were sustained and the bill corrected, the others were overruled and the bill signed. To this action of the court in allowing the bill, the plaintiff below excepted and within fifty days had allowed a bill of exception to the action of the trial court in allowing such former bill of exceptions.

A cross-petition in error was filed in this court by Morris, among other things attacking the allowance of the bill of exceptions of the plaintiff in error.

ALLREAD, J.

We do not deem it necessary to discuss all of the numerous questions presented in the record or suggested by counsel. Those only which are considered important will be adverted to. The validity of the bill of exceptions

taken upon the trial of cause is challenged upon the grounds following:

*First*—That it was not properly presented, allowed and authenticated.

*Second*—That it does not purport to embody all the evidence.

*Third*—That the bill of exceptions as allowed is not true.

To sustain the claim that the bill of exceptions was not properly allowed or authenticated, it is proposed to show that the trial judge was not present in Miami county on the date of the journal entry, and hence could not and did not make the order authenticating the bill of exceptions.

Without deciding whether it is necessary for the trial judge to approve or allow the entry of authentication in open court, it is sufficient in this case that it appears from the records as certified, that the order was made in open court and is regularly on the journal of that court; hence, the remedy, if any, is by application in the court below in the first instance to strike such entry from the journal. *Sedam* v. *Meeksback*, 3 Ohio Circ. Dec., 424.

No extrinsic evidence can be received here to dispute the record. *Huddleson* v. *Hendricks*, 49 O. S., 297; *Sedam* v. *Meeksback, supra.*

It is further contended that the bill of exceptions was not allowed by the court or filed within the time provided by law.

The facts shown by the record are that the bill was presented to plaintiff's counsel on the thirty-third day after the overruling of the motion for a new trial, and to the trial judge on the forty-first day thereafter, who extended the time of allowance ten days beyond the fifty days by indorsement on the bill.

On the fifty-ninth day after the overruling of the motion for a new trial, the bill was signed by the trial judge. On the evening of the succeeding day it arrived by express in the city of Troy, Miami county. The clerk's office being closed and the messenger not being able to find the clerk, the bill was retained until the following morning when it was deposited with the clerk.

On the same day, being the sixty-first day after the overruling of the motion for a new trial, an entry authenticating the bill of exceptions was placed on the journal, which, among other things, contained the following: "And thereupon said court, on the 11th day of March, 1895, allowed said bill of exceptions and did thereupon sign the same and ordered it to be made part of the record of this case. * * * This entry is in fact made the 13th of March 1895, (being the sixty-first day), and this day spread upon the journal, but by order of the court through the telegram hereto attached, is placed on the journal as of March 11, 1895."

Section 5302 requires the bill to be allowed and signed (where the ten days' extension is allowed) within sixty days after the overruling of the motion for a new trial and provides "The bill of exceptions shall be filed with the pleadings, * * * and an entry of the allowance and signing of the same must be entered upon the journal within the time fixed for such allowance and signing."

The former practice required the journal of the court to be kept open for thirty days after the trial term adjourned, and that the entry of authentication be entered thereon as of the term. It was then held that a compliance with this section was necessary to make the bill of exceptions available. *Hill* v. *Bassett*, 27 O. S., 597; *Bush* v. *Railway Co.*, 26 O. S., 643. But it was held that when the order authenticating the bill was actually made within the proper time the trial court had power thereafter to substitute such entry *nunc pro tunc*. *Bothe* v. *Railway Co.*, 37 O. S., 147; *Mitchell* v. *Thompson*, 40 O. S., 110; *Toledo* v. *Preston*, 50 O. S., 361; *Cleveland Leader Printing Co.* v. *Green*, 52 O. S., 487.

The provisions of the act of March 22, 1892, concerning the entry of authentication made to conform to the amendments as to time for allowing the bill, ought not to be construed so as to charge the party excepting with the duty of having the entry actually entered upon the journal. When he procures his bill to be signed and allowed and the order of authentication actually made it becomes the duty of the clerk to enter it upon the journal, and if he fails to do it, the party ought not to be without remedy.

This provision therefore of section 5302 does not, in the opinion of the court,

supersede the power of the trial court to make the entry of such order of allowance *nunc pro tunc.*

That, in our judgment, is the effect of this entry, and we are bound to presume from the state of the record that the trial judge had before him such state of facts as justified the entry of the order *nunc pro tunc,* and therefore such entry has the same effect as if it had been entered upon the journal on the 11th day of March, 1895, which was within the time provided by law for the allowance and signing of the bill.

The filing of the bill of exceptions within the time of allowance, etc., is not essential to its validity. Section 5302 has not been materially changed as to its construction in that regard since the decision of *Patterson* v. *Myers,* 31 O. S., 103, which holds that the mere omission to file the bill with the clerk during the term will not invalidate it. It is there said that, " When duly perfected and ordered to be made part of the record, it is in law to be regarded as part of the record whether it came into the actual possession of the clerk during the term or not." The expressions used by the learned judge delivering the opinion in case of *Young* v. *Shallenberger,* 53 Ohio St.; 291, were made with reference to the facts of that case and do not conflict with the decision announced in *Patterson* v. *Myers, supra.*

It is also claimed that the various exceptions complained of not having been reduced to writing at the time, are not available here in the absence of an order giving time " to reduce the same to writing not beyond fifty days after the overruling of a motion for a new trial."

If the provisions of section 5298 alone, governed, a strict construction might justify such contention, but when taken in connection with the provisions of other sections in chapter IV, we cannot see how such construction can fairly be given.

Prior to the recent amendments section 5298 provided, " The party objecting to the decision must except at the time the decision is made, and time may be given to reduce the exceptions to writing, but not beyond the term."

Section 5301 then provided that in cases where the decision was not entered on the record, or the grounds did not sufficiently appear in the entry, or the exceptions were to the opinion of the court on a non-suit, or upon a motion for a new trial, etc., "the party excepting must reduce his exception to writing and present it to the court for allowance." Section 5302 required the court, if the exception be true or after correction, to allow and "sign it before the case proceeds, or, if the party excepting consents, within thirty days after the term."

In the case of *The State ex rel. Otenberger* v. *Haws,* 43 O. S., 16, exceptions were taken during the progress of the trial and also after the verdict to the overruling of a motion for a new trial. Counsel being unable to complete their bill of exceptions before the adjournment of the court, requested an extension of thirty days and that the journal be kept open for the purpose of perfecting such bill. This was denied on the ground that the trial judge wished to break up the lazy habit of postponing of bills until the last day of the term. On the same day the court adjourned. The bill was presented four days later and the trial judge refused to allow it.

JOHNSON, J., deciding this question, says: " The effect of section 5302 is to extend the time for the performance of this duty (*i. e.* signing and allowing of the bill of exceptions ), within thirty days after the term, with the consent of the exceptor * *. We hold that the relator upon the facts stated, had the same right to present his bill within thirty days as he had during the term, and that it was the duty of the court, if the bill be true or if not then after it is corrected, to allow and sign the same."

If the provisions of section 5298 as it then stood had controlled, and if the construction contended for here had been given, the trial judge there would not have been compelled to sign the bill of exceptions after the term. But as there held the provisions of sections 5301 and 5302 imperatively required him to sign a true bill within thirty days after the term.

The recent amendments do not destroy the force of the Hawes case as a

guide in the construction of the provisions of these sections as they now stand. The purpose of these amendments was to better secure to the parties reasonable time and opportunity for the preparation and examination of the bill of exceptions taken during the progress of a trial, and in cases where, as provided in section 5301, "the decision is not entered on the record or the grounds of exception do not sufficiently appear in the entry, or the exception is to the decision of the court on a motion to direct a non-suit, or to arrest the testimony from the jury, or for a new trial for misdirection by the court to the jury, or because the verdict, or if the jury is waived, the finding of the court is against the law and the evidence, or for the admission or rejection of evidence," and the exception is not reduced to writing during the progress of the trial, the party excepting is entitled to fifty days from the overruling of a motion for a new trial, in which to have his bill of exceptions allowed by the trial court, subject to the conditions prescribed therein of presenting it to the opposite counsel within ten days and to the trial judge within five days preceding the expiration of the fifty days, and subject also to the power of the judge to grant an extension of ten days beyond the fifty days.

In the case of *Young* v. *Shallenberger, supra,* these sections were considered and was then held that the trial court had discretionary power under section 5298 to fix a shorter period than fifty days for reducing the exceptions to writing, but that the time for allowance of the bill as fixed by the sections 5301 and 5302 cannot be reduced by the court. And an order of the court fixing the time for signing and allowing the bill was construed as fixing the time for reducing the exceptions to writing.

In the case at bar the court did not limit the time for reducing the bill to writing, and in the absence of such an order the full statutory period would be allowed, subject to the condition of presentation to counsel and the court within the prescribed time prior to the expiration of the fifty days.

It is next insisted that the certificate of the trial judge does not show that the bill of exceptions allowed upon the trial is a true bill or that it embodies all the evidence in the case. The certificate of the trial judge attached to the bill of exceptions is as follows:

"And the defendant thereupon prays the court here to sign and seal this its bill of exceptions and order the same to be made a part of the record in this case, but not spread upon the journal, all of which is done and ordered this 11th day of March, A. D. 1895.

"Before signing this bill of exceptions I call attention to the matters complained of by plaintiff's counsel in 118 objections to said bill, filed February 22, 1895, As to some few of them my own memory sustains said counsel, and I have at different places in said bill made emendations in my own hand writing. Other matters I call attention to here, there not being any place left for their insertion in the body of the bill.

"*First*—Said bill does not show the fact that upon the trial of this case in the month of November, 1894, after the impanelling of the jury, and before the offering of any oral testimony, the court sent the jury under the charge of the court constable, P. J. Goodrich, under the usual cautions, admonitions and instructions of the court, to which no exceptions were taken by either of the parties to this case, to view the locality of the line of railroad known as the Piqua and Troy Branch R. R. Also the various pieces of property claimed to have been purchased by the plaintiff for the defendant. Also the way and manner in which said railroad is located upon said lands, and also the location of said railroad with reference to the east bank of the Troy hydraulic canal. That said jury did in fact under charge of said constable, view the said premises, and that no exceptions were made by either of the parties to this case to the manner of said view.

"*Second*—It does not sufficiently appear in said bill that during the trial there was produced and read to the court certain motions for the production of certain documents alleged to be under the control of the defendant, which motion had been heard to another judge of this court, previous to this trial, and found

by him to be true, and an order made by him for'their production, and the further order of this·trial judge upon this third trial of this case, for their production before the court, and of the failure of the defendant to have produced some of those called for by plaintiff, all of which ought to have been inserted in full at the point marked by asterisks, or rather x's on page 250 of this bill. I only remember the substance but not all of the details of said matter.

"*Third*—It is my recollection that the charges of the court upon the second trial of this case, were not offered in evidence in this third trial, and how they appear I do not know, except being attached to the bill of exceptions of the second trial, they inadvertently crept in and they must therefore be eliminated from this bill.

"*Fourth*—There are certain crudities in the bill as to what the court ruled in some few occasions, but I do not attempt to correct them for the reasons which will immediately appear.

"Having gone through the entire list of objections and examined this bill with reference thereto, I am not able to state from memory whether or not there are other enlargements or emendations of the record in said bill, the trial having continued through three weeks, and there having been almost continuously cross remarks between opposing counsel, and I could not·undertake to tell what further corrections, if any, I could make without the aid of both stenographers, Miss Edgar for the defendant, and Mr. Grosvenor, the court stenographer in this case, with their original notes to compare with each other, and as I have spent all the days and late at night since the bill came into my hands until now, at the close of the sixtieth day, there is no time left for that. Therefore, except as herein allowed and corrected, each and every one of said objections of plaintiff's counsel are overruled by me, to which rulings each and every one exceptions were taken by said plaintiff's counsel. Counsel on both sides except to said corrections. Defendant's counsel because not being correct, and plaintiff's counsel because of their not being full enough as they claim in some particulars, and said plaintiff's counsel also excepts for the further claim that the bill ought not to be signed at all, as not having come into their hands within the time limited by law, which they offer certain affidavits to support.

"And now counsel ask me to fix a time, not exceeding fifty days from this date, for the preparation, allowance and signing of a bill of exceptions to the various matters now here done by me, including the signing of this bill, and accordingly the court fixes the 30th day of April, A. D. 1894, as said limit of time, being fifty days from this date.

"Signed and sealed this 11th day of March, A. D. 1895.

[ SEAL. ]                  "JOHN C. MILLER,

"*Judge of the Court of Common Pleas, and Trial Judge in the above entitled case.*"

This certificate is somewhat involved and obscure. The first and third statements, however, may be fairly construed to correct the bill of exceptions in the particulars named. The second statement relates to a proceeding for the production of certain documents which the defendant below failed to produce. The proceedings were before the court and were not evidence in the case. It is not alleged by either party as prejudicial error. The plaintiff below obtained the order he sought, and of course could not complain so far as the action of the court is concerned. The defendant below failed to regard the order for the production of the papers. It was the duty of the plaintiff below to resort to the remedies provided by statute in such cases, and if the trial court would then refuse to act he might be prejudiced. We are unable, as the case stands, to see how the proceedings before the court necessarily belong in this bill of exceptions.

The trial judge suggests in his fourth statement that there are certain crudities in the bill and underta' ıs to make a statement of what those crudities are. He says that he has gone tlı ough the entire list of objections made by the plaintiff below and examined the bill with reference thereto, and is not able from memory to state any enlargements or emendations to the bill, and could not undertake to tell whether any further corrections could be made without the aid

·of both stenographers to compare their original notes, and not having time for that he overrules further objections to the bill. We think by an examination of this statement the crudities suggested by the trial judge are artificial. He sees proper to set forth upon the record the amount of energy, and patience, and time, and care, given to the examination of the bill, and in substance says that having used all the time afforded him by the statutes, he is unable to state whether the bill of exceptions might be enlarged or corrected. It is certainly not for us to say that it still would have been the duty of the trial judge to have procured the .assistance of both stenographers and compared their notes. The trial judge him- :self having discharged this duty to his satisfaction, having exhausted the time given him by law in its examination, and having then overruled all objections ·except where corrections were made, and having signed and certified the bill and caused an entry of allowance to be placed upon the journal, it is not our duty to say in contradiction to his certificate and the journal entry of the court, that the bill is not a true bill.

Counsel for the plaintiff below at the time their objections were presented to the trial judge, undertook to sustain the same by the affidavit of counsel and ·others, and when their objections were overruled and the bill was signed, the plaintiff below excepted and thereafter attempted to perfect and have allowed, against the objection of the plaintiff in error, a bill of exceptions purporting to be their exceptions to the action of the trial judge in allowing as true the bill of exceptions as taken upon the trial of the case.

There is no authority for such latter bill of exceptions. Such practice would lead to great confusion. Bills of exceptions, if such practice prevailed, would be taken to the orders allowing each successive bill of exceptions *ad infinitum.* The certificate of the trial judge is conclusive. *State ex rel. Hawks* v. *Bickman,* 2 O. C. D., 526; *State ex rel. Atkins* v. *Todd,* 4 Ohio, 351.

Having disposed of these objections to the bill of exceptions we may now ·consider some of the more important errors claimed by the plaintiff in error as a ground for a reversal of the judgment of the common pleas. The plaintiff in error requested the trial judge to discharge the jury and proceed to try the cause without the intervention of a jury. It is clear to us that the issues made in the ·cause upon the petition were triable to a jury. While it is true that the cross-petitions were equitable in their nature, yet they did not extinguish or supersede the case made in the petition. *Buckner* v. *Mear,* 26 O. S., 514.

The main grounds of error claimed by the plaintiff in error are: First, That the contract as claimed by the plaintiff below is against public policy, and Second, That the contract as claimed by the plaintiff in error is not supported by the evidence. The question of public policy is made by the record in various ways, mainly, however, by the demurrer to the replies, the motion filed by defend- ant below to take the case from the jury and for a judgment in their favor upon the close of the plaintiff's testimony, and by the charge of the court. It is not entirely clear that the question of public policy is fairly raised by the demurrer to the reply, and we will therefore consider the case as it stood when the defend- ant below made its motion at the close of the plaintiff's testimony. It will be remembered that the plaintiff below sought to recover for moneys expended and for services rendered under a contract made about the month of April, 1885. He claims that from the time he entered the employ of the defendant below, he ·devoted substantially all his time and energy to the securing of the right of way from West and Clay streets in the city of Troy, through the city of Troy north- wardly to a point some distance beyond, known in the history of the case as Statler's south line. That these services continued for something over three years. Morris was a member of the council of the city of Troy from A pril, 1885, until April, 1887. That, beginning in April, 1885, until April, 1886, orris was active in council in securing to the Piqua and Troy Branch, rights ol way over the streets and alleys of the city of Troy. He introduced and supported a reso- lution to open up Raper street and Hydraulic avenue. Proceedings were insti- tuted to widen Raper street to meet the demands of the company. Morris

introduced and supported and voted for resolutions and ordinances extending and opening up Hydraulic avenue southwardly and eastwardly to meet the proposed line of railway, at a cost to the city of from six to eight thousand dollars, and granting to the Piqua and Troy Branch Railway company rights of way thereon. He introduced and supported an ordinance granting rights of way over Market, Mulberry and other streets to such railway company. From the very nature of the case these rights of way acquired from the city, were of prime necessity to the railway company. From the correspondence introduced during the testimony of the plaintiff, it appears that the acquisition of these franchises from the city was the foundation for any steps whatever being taken by the company to build the road. The letter of Morris to Waite, dated October 7, 1885, estimates the costs of the right of way at $12,000, but he says, " At a meeting of the city council (last night) an ordinance was adopted granting the right of way to T. & P. B. R. R. over Raper street and all street crossings from West street to Garfield avenue. A resolution was also adopted requiring proceedings to be immediately instituted on behalf of the city to condemn property to open streets and avenues from West street to Main street. This will be done at the expense of the city and if successful the estimate above ($12,000) will be reduced probably $5,000, leaving the amount for damages and right of way from West street to township line about $7,000." From that time on it was assumed by Waite, representing the railway companies and Morris, that the city of Troy would condemn and open Hydraulic avenue at the expense of the city, so that the cost to the railway company would be reduced to $7,000.

Morris, in his letter of November 15, 1885, says, " I have had a hard struggle to accomplish what has already been done—right of way on Raper street, building of avenue, etc.—and to accomplish more, would, in my judgment, be impossible." And then proceeds to state what had been done as to the acquisition of other rights of way. It having been discovered that Raper street was only twenty feet wide, the railway company insisted upon a right of way sixty feet wide. In that connection Morris, in his letter of December 9, 1885, says, " Now, Raper street is but twenty feet wide when opened, and acting upon your telegram, I introduced last night and had passed an ordinance changing the line of the avenue sixty feet in width to St. Clair avenue so as to have it terminate near the junction of Plum and Grant streets." The letter of February 9, 1886, of Morris to Waite also carries out the same idea, to-wit, that the railway company was insisting upon their franchises from the city as the foundation of their proceeding in the matter of constructing the road.

Now, if we adopt the theory contended for by the plaintiff to support his cause of action, that from April, 1885, on, he was in the employ of the railway company, it would be to assume that Morris was engaged in serving two masters. As a member of council he would represent the interests of the city, and as an agent of the railway company he would be interested in securing these franchises from the city upon as favorable terms as possible. These attitudes were inconsistent. The city was entitled to the benefit of his unbiased judgment, his energy and his business capacity as a member of its council. The granting of these franchises to the railway company was an important transaction on behalf of the city. The question therefore is, is such contract against public policy? It is said by high authority, "In law as in morals it may be stated that as a principle no servant can serve two masters, for he would either hate the one and love the other, or else he would hold to the one and despise the other."

It is well established in all the reported cases that a contract against the policy of the law will be given "no countanence or assistance in *fori civili*."

LANE, J., says in the case of *Spurgeon* v. *McElwain*, 6 Ohio, 444, "The principle is of general application that contracts contrary to sound morals, public policy, or forbidden by law, will not be executed by courts of justice."

It is said by Lord MANSFIELD, "No court will lend its aid to a man who founds his cause of action upon an immoral or illegal act." And again, in the same case (Cowp., 341), whenever an agreement appears to be illegal, immoral,

or against public policy, a court of law will leave the parties as it finds them."

It is not material in this case to inquire whether the franchise, actually granted by the city were beneficial to the city or otherwise. It is not a question as to whether the contract is a good or bad one, but the courts look only at the tendency.

Greenhood in his work on Public Policy, on page five, says: "The question of the validity of the contract does not depend upon the circumstance whether it can be shown that the public has in fact suffered any detriment therefrom, but whether the contract is in its nature such as might have been injurious to the public."

In the well considered case of *Piatt* v. *Longworth*, 27 O. S., 159, which involved a sale made by an administrator to a relative, the administrator having some secret interest, JOHNSON, J., says on page 195, "In such cases the court will not suffer itself to be drawn aside from the application of this equitable rule by any attempt on the part of the purchasers to establish the fairness of the purchase, because of the danger of an imposition and the presumption of fraud, inaccessible to the eye of the court.

"The policy of the rule is to shut the door against temptation in cases where this relationship exists; it is of itself deemed sufficient to create the disqualification. The sale will be set aside, not because there is fraud, but because there may be fraud."

This principle is well stated by ELLIOTT, J., in the case of *Elkhart County Lodge et al.* v. *Curry*, 98 Ind., 208: "A wholesome rule of law is that parties should not be permitted to make contracts which are likely to set private interests in opposition to public duty or to the public welfare. * * * It is not necessary that actual fraud should be shown, for a contract which tends to the injury of the public service is void, although the parties enter into honestly and proceed under it in good faith. The court does not inquire into the motives of the parties in the particular case to ascertain whether they were correct or not, but stop it when they ascertain that the contract is opposed to public policy, nor is it necessary to show that any evil was done by or through the contract. The purpose of the rule is to prevent persons from assuming a position where selfish motives may impel them to sacrifice the public good to private interests."

The evil tendency of a contract with a member of council to assist a railway company in the procurement of rights of way over the streets and avenues of the city is apparent. And as stated by WILLIAMS, J., in the case of *Kahn, Jr.*, v. *Walton*, 46 O. S., 207, quoting from Lord MANSFIELD, "If from the plaintiff's own stating, or otherwise, the cause of action appears to arise *ex turpi causa*, or the transgression of a positive law of this country, there the court says, he has no right to be assisted. It is upon that ground that the court goes; not for the sake of the defendant, but because they will not lend their aid to such a plaintiff."

So that in the case at bar, whenever it appeared from the plaintiff's own stating, or otherwise, that the cause of action was against public policy, it was the duty of the court to dismiss the action. It is, however, claimed by the plaintiff below to avoid the question of public policy, that it had been determined by the council of the city of Troy, and even by the council of the village of Troy before it became a city, and by each member of the council individually, that Hydraulic avenue was to be dedicated and devoted to railroad purposes, and that the action of Morris in supporting and voting for these various resolutions granting rights of way, was merely formal and in compliance with such previous agreement. There was no agreement by the council of the village of Troy, or of the city of Troy, which would have required absolutely, the passing of these ordinances. Whatever may have been the individual agreement of the members of the council, it would not have prevented the council when in session and acting as a body, from refusing to grant the franchises. *McCortle* v. *Bates*, 29 O. S., 419.

It was the duty of such members of council to exercise their best judgment

when the matter came before them in session, and whatever may have been their previous views or agreement, they had a right to change their mind and vote in accordance with their then judgment. *Fuller* v. *Daane*, 18 Pick., 472.

The more serious question in this connection is, whether public policy would prevent recovery of moneys advanced for rights of way as claimed in the first cause of action. The rule is laid down that where a contract is supported or based upon two or more considerations, if any one of them be opposed to public policy the contract is void, unless so much of the promise as is based distinctly and solely upon the good consideration is separable from the remainder. Greenhood on Public Policy, page 17.

In the case of *Widoe* v. *Webb*, 20 O. S., 431, it is said that, "When, however, for a legal consideration, a party undertakes to do one or more acts, and some of them are unlawful, the contract is good for so much as is lawful, and void for the residue. Whenever the unlawful part of the contract can be separated from the rest it will be rejected, and the remainder established. But this cannot be done when one of two or more considerations is unlawful, whether the promise be to do one lawful act, or two or more acts, part of which are unlawful; because the whole consideration is the basis of the whole promise. The parts are inseparable. * * * And it has been said with much force, that where parties have woven a web of fraud or wrong, it is no part of the duty of courts of justice to unravel the threads and separate the sound from the unsound."

In the case of *Spurgeon* v. *McElwain*, *supra*, the builder of a building to be devoted to the keeping of a nine pin alley (which was unlawful), was not allowed to recover on the grounds that it was an erection *sui generis* whose ordinary use in such places is unlawful, and that it would thereby tend to aid the owner in an illegal action and therefore ought not to be assisted by the law.

In the case of *McQuade* v. *Rosecrans*, 36 O. S., 442, it was held that the consideration for a mortgage was entire, and a portion being illegal the court would not aid in its foreclosure even for the legal part.

It was also held in the case of *Sullivan* v. *Hergen* (R. I.), 20 Atl., 232, that where a clerk was employed in running a grocery and tending bar (tending bar being illegal) the clerk could not recover *quantum meruit* for his services in conducting the grocery part. The contract being illegal was entirely void.

The contract, therefore, set out in the second amended petition providing for Morris' services and for expenditures of moneys in acquiring rights of way from West and Clay streets in the city of Troy to Statler's line, being inseparably connected with the service and efforts of Morris as a member of council, and having a tendency to influence his action as such member of council, was contrary to public policy, and the doctrine "*ex turpi cause non orator actio*" applies. The consideration being entire it is not our duty to separate the sound from the unsound, but will leave the parties where it find them.

So far, therefore, as the evidence tended to support the contract set out in the petition, it was manifestly insufficient for the cause of action which it tended to support arose "*ex turpi causa.*"

But upon an examination of the whole record in the case we cannot arrive at the conclusion that a verbal contract existed as claimed by the plaintiff.

To allow evidence of such verbal contract to be considered by the jury, it must appear whether (1) That the written contract of May 19, 1886, was not a contract, or (2) That the subject matter of the verbal contract was not included in such written contract or any of its modifications.

We are not unmindful of the rule which imposes upon the jury the duty of weighing conflicting testimony. But how stands the case upon the testimony of the plaintiff, weighed in connection with the correspondence, contracts and documents introduced and submitted by him?

We do not deem it necessary to take up the different items of correspondence in detail, between Morris and Waite (representing the railway company) and others, which necessarily formed the *r s gesta* in connection with the written contract in this case.

C., H. & D. R. R. Co. v. Morris.

All of the documentary evidence, all of the correspondence between Waite and Morris and Judge SULLIVAN, points with reasonable certainty to the truth and good faith of the contract of May 19, 1886. The negotiations proceeded step by step in natural and usual order. The parties were dealing at arms length and in an adversary way. If the contract was intended as a blind, why all this flickering in private letters between Morris and Waite?

After several months conferring verbally and by letter, Morris writes to Waite on March 10, 1886, foreshadowing the written contract and settling the adversary character of their negotiations. He says: "In your letter to Mr. Sullivan and in your congratulatory despatch to me, it seems impossible to satisfy your mind that $7,000 furnished by the railroad company and the $3,200 subscribed by citizens, is sufficient to secure the right of way and damages from West street in Troy to Skinner's south line. You, therefore, seem to insist upon 'a guarantee.' * * * Now to settle this question of 'guarantee,' I submit for your consideration the following: I will myself give bond in the sum of one hundred thousand dollars to save the company harmless against any further expenditure of money than $7,000, provided the said company will place the amount of $7,000, together with the amount (represented good beyond question) of the subscriptions of citizens in the hands of W. H. H. Dye, Mr. Allen, the First National Bank of Troy, or any responsible depository in trust to be paid to me as needed, in settling for said right of way and damages. I believe this is substantially your proposition when here. I will accept of it—this contemplates a line of road within the options heretofore taken by me and with a view of running by Allen & Wheeler's mill. Should A. & W. fail or neglect to make satisfactory arrangements, I will agree to procure the 'Hydraulic line' to Statlers's south line and give bond accordingly."

This letter, Mr. Morris in his testimony (on page 140 of bill of exceptions), says was in good faith and was intended to mean what it stated and was not written as a blind. He says, however, that it was not acted upon.

It is true that it was not acted upon as a contract, but it was a step in the negotiations which led to the contract of May following, and being in good faith and in harmony with the purposes of the May 19 contract, it is an invaluable aid in determining whether the culmination of their informal negotiations was in "good faith."

Following this letter and the reply of Waite, Morris makes the draft of the contract of May 19, which was submitted to Waite and Ramsey and a modification appended. Morris signed the contract and also the modification, and procured a guarantee to be signed by W. H. H. Dye and others. The contract and modification and guarantee were submitted to R. D. Marshall, Pres. of the P. & T. Br. R. R. Co., who, before executing it on behalf of the company, wrote what is known as his letter of construction of the contract. This letter of construction was accepted by Morris in writing, and the contract was executed by the company.

On September 17, 1886, the contract was again modified by releasing Morris from furnishing right of way north of the county road, forming Mrs. Dye's south line.

The manner and formality attending the execution of this contract and its various modifications, together with the purpose expressed on its face, are inconsistent with the claim that it was intended merely to deceive the public.

This question was presented to, and considered by this court at a former term, and, among other things, it was by STEWART, J., said in deciding the case: "The contract and letters between the parties wholly disprove the claim of the plaintiff that this was not the real contract between the parties; and indeed to accept the theory of the plaintiff's counsel, we must find not only that he and Mr. Waite were engaged in deceiving the public, but in deceiving each other as to the deception."

Morris, however (page 151, bill of exceptions), says of the contract of May 19, "That the purpose for which that writing was intended was in good faith,

and if they had constructed the road with reference to this writing and the purpose for which it was drawn there would have been no trouble here."

In all the subsequent letters of Morris, as well as in his receipts for the consideration, this writing is referred to as a contract, and its terms the basis of liability of the parties.

We cannot conceive of any reasonable pretext for the letter of construction of Marshall or the modification of September 17, consistent with the claim of this contract being a blind to deceive the public, and it seems Morris undertook to give none. He says (page 168): " There was trouble and controversy and I did not know what the result might be in the fix I was in in having signed that paper, and that's the result of that paper of September 17, or the paper's the result of that feeling." The effect of that is, as we understand it, that although claiming the writing of May 19 was intended as a blind, yet there being trouble and controversy about it, Morris, in order to secure the modification of September 17, was willing to and did sign that as a contract. We do not consider how far this might be an affirmance of the contract of May 19, but refer to the admission and failure to give any satisfactory explanation of the modification of September 17, as confirming the position taken by us as to the contract of May 19. Into the contract of May 19 was merged all questions concerning the right of way therein stipulated for.

It is contended that for the services of Morris and money expended in purchasing property not included in the written contract, he is entitled to recover.

The contract of May 19 requires Morris to " furnish " this right of way for a sum therein specified; and his services, as well as money expended in procuring the right of way, would be necessarily included in the contract price, and it would be inconsistent for Morris to assert a claim for services independent of the contract.

The material question, therefore, is, did Morris procure rights of way or make purchases not included in the contract? The right of way provided for in the contract is a continuous way from West and Clay streets in Troy to Statler's south line, on or near the Hydraulic, subject to the modification of September 17.

We think the road was built and rights of way secured on the line contemplated in the written contract. Morris, however, claims for the price paid for the Kinkead and Sayer lots which were purchased prior to the execution of the written contract. He asserts that he made the purchases under a prior verbal contract. These tracts were much wider than needed for roadway purposes, and it was claimed that Morris was to buy these tracts, take the title in his own name, the necessary amount was to be used for right of way; the remainder was originally intended for depot purposes, but Morris claims he was authorized to sell the excess beyond the right of way and account to the company.

Without going into details, we think this claim is clearly inconsistent with the letters and the contract.

Waite, in his letter to Sullivan, calls his attention to the fact that in his estimate of costs of right of way the Morris (i. e. the Kinkead and Sayer) land was left vacant. Morris, himself, answered this letter by his of March 10, 1886. If the Kinkead and Sayer's purchase was governed by a different contract, Morris would hardly have omitted reference to that fact in his letter, but instead of so doing, he, in line with Waite's idea, proceeded to draw up a contract which provides for Morris receiving pay from the company for a fifty foot strip across these tracts. In the letter of R. D. Marshall, accepted by Morris, and which formed a part of the contract of May 19, it was provided that the brick house on the Kinkead property should not pass to the railroad company, but should be removed by the company, free of expense to Morris, to the portion of the lot north of said way.

Afrerwards, and without the assent of the company, in fact without consulting it, Morris barters the remainder of the Kinkead property, subject to the contract of May 19, for western land.

C., H. & D. R. R. Co. v. Morris.

This was inconsistent with the claim of Morris, and taken in connection with the provisions of the contract, it is clear to us that no such verbal contract was made or could have been asserted if made.

As to the contention that the contract of May 19, 1886, was not acted upon or carried out, we may say the evidence shows the contrary. Morris received the contract price, $10,200.00, and receipted for it as in full for contract of May 19, 1886, and except as to the modification of September 17, 1886, Morris fails to show wherein the company failed to carry out the contract.

It appears that the company acted under this contract and its various modifications. Morris also acted under it.

It therefore follows that we are of the opinion that the written contract of May 19, 1886, was the only contract between the plaintiff and the P. & T. Br. R. R. Co. (which was acting for the C., H. & D. Co.), and that the evidence fails to support the verbal contract claimed, and on that ground the verdict is against the manifest of the evidence.

But it appearing from the pleadings and the testimony of Morris, together with the exhibits introduced as a part of his testimony, that the alleged contract claimed in the plaintiff's petition was in violation of public policy, the trial court erred in not granting the motion of the plaintiff in error and dismissing the action as requested by the defendant.

The judgment of the common pleas court will therefore be reversed, and this court proceeding to make such judgment as the court of common pleas ought to have rendered, it is ordered that said motion be sustained and the petition is hereby dismissed.

*W. M. Ramsey, H. H. Williams, Robert Ramsey* and *A. F. Broomhall,* for Plaintiffs in Error.

*Byrkett & Gilbert, Calvin D. Wright, T. B. Kyle* and *Clyde & McPherson,* contra.